## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TAYLOR ENERGY COMPANY LLC, | CIVIL ACTION |
| Plaintiff, | NO. |
| VERSUS | SECTION: |
| CAPTAIN KRISTI M. LUTTRELL, IN HER OFFICIAL CAPACITY AS FEDERAL ON-SCENE COORDINATOR FOR THE MC20 UNIFIED COMMAND, and THE UNITED STATES OF AMERICA, ACTING BY AND THROUGH THE UNITED STATES COAST GUARD, | MAGISTRATE: |
| Defendants | |

## COMPLAINT TO VACATE ADMINISTRATIVE ORDER AND FOR OTHER RELIEF

TO:   THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
      LOUISIANA AND THE HONORABLE JUDGES THEREOF

The Complaint of Plaintiff, Taylor Energy Company LLC ("Taylor Energy"), through its

undersigned counsel, and against Defendants, Captain Kristi M. Luttrell, in her official capacity

as Federal On-Scene Coordinator for the MC20 Unified Command, and the United States of

America, acting by and through the United States Coast Guard, avers as follows:

## PARTIES

1.

At all material times, Taylor Energy was and is a limited liability company organized and

existing under the laws of the State of Louisiana, with its principal place of business in

New Orleans, Louisiana, and was and is duly authorized to transact business within the jurisdiction

{N3747638.2}

of this Honorable Court.  Taylor Energy's only member is Phyllis M. Taylor, a Louisiana resident domiciled in Orleans Parish, State of Louisiana.

2.

Made defendant is Captain Kristi M. Luttrell ("Captain Luttrell"), in her official capacity as Federal On-Scene Coordinator ("FOSC") for the incident known as the MC20 – Taylor Energy Response (hereafter the "MC20 Incident") and the related MC20 Unified Command.  Also made defendant is the United States of America, acting by and through the United States Coast Guard (the "Coast Guard"), which is an agency of the United States under the Department of Homeland Security that can be sued under 28 U.S.C. § 2679, with offices located in this District.  Captain Luttrell and the Coast Guard are collectively referred to as "Defendants."  In her official capacity, Captain Luttrell is a commissioned officer of the Coast Guard, currently assigned to the Coast Guard's New Orleans Sector and serving as the Captain of the Port and Commander of the Coast Guard's New Orleans Sector, and is the official legal representative of the United States of America who, pursuant to 33 U.S.C. §§ 1321(c) and 1321(e)(1)(B), issued Administrative Order No. 19-001 dated October 23, 2018 (the "Admin. Order") and, by letter dated October 25, 2018, denied Taylor Energy's request for review and reconsideration of that Order, constituting a final agency action.  Pursuant to the Admin. Order, Captain Luttrell took, and continues to take, various official actions, including holding the November 6-9, 2018 Unified Command Planning meeting (the "November 2018 UC Meeting"), the selection and designation of a contractor to conduct response activities pursuant to the Admin. Order, issuance of a Notice of Federal Assumption dated November 16, 2018 (the "Notice") and a Decision Memorandum dated November 16, 2018 (the "Memo").

## SUMMARY OF ACTION

3.

This lawsuit seeks the Court's review and setting aside of the final agency action taken by the Coast Guard in which it abruptly reversed course on its prior position based predominantly on an unverified theory that contradicts the longstanding accepted scientific facts that underlay the Coast Guard's prior policy with respect to response actions at the MC20 site.  Although the unverified theory had been available to the Coast Guard for over a month, at a minimum, and notwithstanding that observed conditions at the MC20 site had not changed, the Coast Guard issued its final agency action, the Admin. Order, one day after a front-page news article in the *Washington Post* reported the conclusions of the unverified theory to the public and questioned the Coast Guard's competence in supervising the MC20 response.  The Coast Guard's actions ignored a decade's worth of scientific studies conducted for the Unified Command and observations that concluded that any releases of oil were at worst de minimis and ignored the fact that there was no intervening observable event at the MC20 site that suggested the amount of oil released had increased exponentially, as the Admin. Order concluded.  The Coast Guard's actions were an abrupt departure from the well-verified scientific conclusions in the record and were taken in response to adverse publicity, rather than in response to any imminent and substantial threat to the public health or welfare.

As established in this Complaint, the Coast Guard took this action without adequate justification, without any advance notice to Taylor Energy and without providing Taylor Energy with a meaningful opportunity to review and comment on the findings on which the Coast Guard based the Admin. Order.  Indeed, since taking this action, the Coast Guard has continued to conceal from Taylor Energy the underlying facts and data that purportedly support the Admin. Order,

despite ordering Taylor Energy to perform work that depends on knowledge of those facts and data and in disregard of the extreme risk of adverse environmental consequences that may result from the performance of work at the site without careful deliberation and study of the longstanding pre-existing scientific record pertaining to the MC20 site.

## JURISDICTION AND VENUE

4.

Jurisdiction exists under 28 U.S.C. § 1361, the Court's admiralty and maritime jurisdiction, 28 U.S.C. § 1333, and as a civil action arising under the Constitution and laws of the United States pursuant to 28 U.S.C. § 1331, including the Oil Pollution Act of 1990, 33 U.S.C. §§ 2700-2762 and the attendant regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (the "APA"). Taylor Energy also seeks a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 703. Taylor Energy has the right to bring this action to seek judicial review of final agency action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706. *See Sackett v. EPA,* 566 U.S. 120 (2012) (jurisdiction properly exists over claims seeking APA judicial review of agency action taken pursuant to the Clean Water Act). The Administrative Procedure Act expressly waives sovereign immunity of the Defendants for the actions alleged herein.

5.

Venue is proper in this District pursuant to 28 U.S.C. § 1391. Further, a substantial part of the events and omissions giving rise to Taylor Energy's claims occurred in this District, including issuance of the Admin. Order, the Notice and the Memo, and the November 2018 UC Meeting presided over by Captain Luttrell in her official capacity as the FOSC, as well as other actions taken by the Coast Guard and Captain Luttrell after issuance of the Admin. Order.

## RELEVANT FACTUAL BACKGROUND

### The September 2004 MC20 Incident

6.

This action arises out of an actual case and controversy between Taylor Energy and the Defendants regarding a 2004 pollution incident during Hurricane Ivan, an Act of God event, which caused a massive seafloor shift and failure, which toppled Taylor Energy's production platform, known at the MC20A Platform, which was located in federal waters adjacent to the State of Louisiana in an offshore lease area known as Mississippi Canyon Block 20, which is approximately 10 miles offshore of the coast of Louisiana at the mouth of the Mississippi River.

7.

Prior to the sale of substantially all of Taylor Energy's assets during 2008, Taylor Energy's principal business was the exploration, development and production of oil and gas on the Outer Continental Shelf of the United States ("OCS") in the Gulf of Mexico. Taylor Energy was the lessee and operator of the MC20A Platform and an OCS lease that includes the MC20A Platform, wells and associated facilities (collectively, "MC20").

8.

On or about September 16, 2004, Hurricane Ivan struck the Louisiana and Mississippi Gulf Coasts. Prior to Hurricane Ivan, there were 28 wells connected to the MC20A Platform, 3 of which were temporarily abandoned, 8 of which were shut in indefinitely, and 17 of which had been

producing, 13 of which could produce only with lifting assistance, but which were shut-in when the platform was evacuated due to the approach of Ivan.[1]

9.

Ivan alternated between a Category 4 and a Category 5 storm as it traveled the Gulf of Mexico and, through a series of unforeseen and unprecedented events, caused a massive seafloor shift and failure that toppled Taylor Energy's production platform and scattered debris on and under the seafloor.  The massive seafloor shift and failure also buried the MC20 wells beneath approximately 150 feet of mud and sediment (the "MC20 Incident").

10.

As a result of the unprecedented seafloor collapse, the platform now lies about 550 feet downslope and southeast from its original location, and the well bores rest in a buried tangled web. The toppling of the MC20A Platform and its subsequent movement downslope shifted the stationary well conductors out of the platform's well bay and bent each well conductor (and related tubular assemblies) at almost a 90 degree angle.

**Taylor Energy's Immediate Response and Actions Taken to Address the MC20 Incident**

11.

As a result of the foregoing events, hydrocarbon leaks occurred in the area of the MC20 site.  Taylor Energy immediately notified the appropriate Governmental authorities of the loss of the platform and began responding to the MC20 Incident, including addressing a sheen of oil on the water's surface in the area where the platform once stood.

---

[1] By "lifting assistance" Taylor Energy means adding artificial conventional measures to promote and enable production.

12.

Taylor Energy was subsequently designated by the Coast Guard as the "Responsible Party" for the MC20 Incident in accordance with the Oil Pollution Act of 1990.  For over a decade, Taylor Energy has fully cooperated with and responded to various directives of the Coast Guard and other authorities and has been an active and fully cooperative participant in numerous Unified Command meetings that were convened by the various Federal On-Scene Coordinators that have been designated by the Coast Guard.  Captain Luttrell is the sixth person to serve as the MC20 FOSC in the past ten years.

13.

Effective June 28, 2007, the MC20 OCS lease terminated, and, consistent with its regulatory practice and procedure, in October 2007, the Government ordered Taylor Energy to permanently plug and abandon all wells at MC20 "within a period of one year" from termination of the lease, or by June 28, 2008.

14.

Taylor Energy and the Government, however, subsequently recognized the difficulty of pursuing decommissioning of the wells through conventional plugging and abandonment techniques due to (among other things) the burial of the tangled well bores.  They therefore agreed to examine alternatives for decommissioning the wells, including the concept of drilling "intervention" wells to plug the existing wells.[2]

---

[2] A diagram (not to scale) depicting the tangled well bores is attached hereto as Exhibit "A."

15.

Following detailed studies, and with the express consent and approval of all necessary Governmental authorities, including the Coast Guard, Taylor Energy drilled nine intervention wells.  This action successfully sealed each of the nine MC20 wells that had the highest flow potential and that posed a substantial threat of discharge of oil in their post-Ivan condition.  These activities reduced, but did not completely eliminate, the surface sheen.  Taylor Energy also flushed and permanently sealed off the parted pipeline segments at MC20 and removed the platform's deck and associated platform debris from the sea floor.

16.

In the Fall of 2007, consistent with the National Contingency Plan, a Unified Command was established by the Coast Guard to monitor the MC20 site and to study, address and evaluate possible further actions to be taken related to the MC20 Incident.  The Unified Command is presently composed of the Coast Guard and Taylor Energy.  Since the establishment of the Unified Command over a decade ago, there have been multiple FOSCs.  On or about June 15, 2018, Captain Luttrell became the sixth designated FOSC in the last ten years and currently serves in her official capacity as the FOSC and is part of Unified Command structure.  Captain Luttrell also issued the Admin. Order, the Notice and the Memo and conducted the November 2018 UC Meeting, which are the subject of this Complaint.  *See* Exhibits "B," "C" and "D" attached hereto respectively.

17.

The Unified Command structure established in the Fall of 2007 continues to today.  There is a lengthy Administrative Record detailing the history of Taylor Energy cooperatively working with all relevant governmental agencies through the Unified Command structure in a joint and

collaborative fashion, including the five Coast Guard officials who served as the FOSC prior to Captain Luttrell's designation.

18.

From the start, Taylor Energy's principal concern has always been, and continues to be, to ensure protection of the environment by taking scientifically supported actions to prevent, minimize and mitigate the discharge of oil, as well as the potential threat of discharge of oil, from the MC20 site.

19.

For more than a decade, the Coast Guard and Taylor Energy under the Unified Command structure have engaged in extensive and comprehensive collaborative scientific studies, assessments, and evaluations to address the MC20 Incident, including all response actions. Taylor Energy has fully complied with all administrative orders and has provided all reasonable cooperation and assistance requested by federal officials. By way of example only, Taylor Energy's comprehensive response efforts, as directed by the Unified Command, have included the development of cost saving technologies associated with drilling the intervention wells, the construction and deployment of three containment domes to assist in the elimination of hydrocarbon plumes, overflights to monitor the surface sheen, and the assembly of a group of the world's preeminent experts in their respective fields, most at the Government's direction and consent, to conduct scientific studies and analyses and to develop "consensus" strategies for addressing any remaining ecological risk posed by the MC20 Incident. Notably, although at Taylor Energy's expense, these studies and the retention of the world's preeminent experts, including those regularly retained by the Government, have been conducted at the direction of the

FOSC.  To date, Taylor Energy has expended in excess of $480 million in its efforts to address the MC20 Incident.

### UNIFIED COMMAND ENDORSED ACTIVITIES: THE "CONSENSUS" ECOLOGICAL RISK ASSESSMENT ("CERA") WORKSHOP AND REPORT

20.

Following Taylor Energy's successful completion of the ninth intervention well during 2011 and the well flow and integrity assessments performed by a "well review workgroup" and the geotechnical data review performed by a "sheen source workgroup," the Unified Command convened "a broadly-based group of stakeholders with applicable expertise" to participate in a workshop and conduct a Consensus Ecological Risk Assessment ("CERA") during May and June 2013.  *See* Ecological Risk Assessment: Consensus Workshop, An Examination of the Potential Ecological Impacts of Response Alternatives Being Considered for Sheen Abatement for the Remnants of the Taylor Energy Company, LLC MC20A Platform – Gulf of Mexico ("the CERA Report"), July 2013, at 1.  A copy of the CERA Report is attached hereto as Exhibit "E."  "The CERA process is designed to help environmental managers compare ecological consequences of specific response options."  Exhibit "E," CERA Report at 2.  One of the main purposes of the CERA process was "to evaluate potential ecological impacts of available response options" associated with Taylor Energy's remaining obligations in connection with the MC20 Incident.  The risk assessment analysis specifically centered on an evaluation of the ecological consequences of soil removal and drilling additional intervention wells.  Exhibit "E," CERA Report at 1-2.  In the Government's own words, the CERA process was "to assess the risks" and "to develop a path forward."

21.

Participants in the CERA workshop included policy officials and experts from two bureaus of the United States Department of the Interior: the Bureau of Safety and Environmental Enforcement ("BSEE"), and the Bureau of Ocean Energy Management ("BOEM"), the Coast Guard, the National Oceanic and Atmospheric Administration ("NOAA"), the Environmental Protection Agency, the United States Geological Survey, the United States Fish and Wildlife Service, Louisiana State University, the Louisiana Department of Environmental Quality, Louisiana's Oil Spill Coordinator's Office and Taylor Energy.  Exhibit "E," CERA Report at Appendix "A."

22.

The CERA process resulted in the issuance of the CERA Report.  The CERA Report contained two primary conclusions endorsed and agreed to by all participating Federal and State agencies, including the Coast Guard:  (1) the ecological risks associated with drilling <u>any</u> additional intervention wells to plug and abandon the remaining sixteen wells <u>outweigh</u> any ecological benefits, and (2) the ecological risks associated with dredging the seafloor to remove contaminated soil <u>outweigh</u> any ecological benefits.  Exhibit "E," CERA Report, at §§ 6.3.1, 6.3.2 and 6.3.7.

23.

With respect to drilling additional intervention wells, the CERA Report specifically concluded:  "[d]rilling intervention wells for all remaining wells or just potential flow wells does not provide sufficient ecological benefits when considered in the context of the risk and impacts associated with the drilling and plugging operations (probability of success, seafloor disturbance, operational discharges, risk of adverse outcome)."  Exhibit "E," CERA Report at § 6.3.2; *see also*

*id.* at § 6.3.7 (recommending not to pursue "additional well intervention because the ecological risks outweigh the possible benefits.").

24.

With respect to removal of the contaminated soil, the CERA Report specifically concluded: "[d]redging options, disposal or capping are not considered practical due to seafloor sediment characteristics and could have unintended adverse consequences from increased releases and resuspension of sediments and contaminants."  It further concluded that "[t]he ecological risk of dredge/dispose and dredge/capping <u>outweighs</u> ecological benefits."  Exhibit "E," CERA Report at § 6.3.1 (emphasis added); *see also id.* at § 6.3.6 ("[t]he group concludes that current sedimentation provides a natural mechanism for attenuation.").

25.

In subsequent years, the Defendants have repeatedly confirmed these primary conclusions reached by the participants in the CERA workshop and as set forth in the CERA Report, which were reached through a process that featured full participation not only by the Federal agencies with expertise and jurisdiction over prevention of pollution from OCS wells but also by State agencies with respective expertise and jurisdiction over prevention of pollution from OCS operations that may affect Louisiana's waters and coast.

26.

As will be shown below, based predominantly on an unverified theory and a *Washington Post* article, Defendants have abruptly and wrongfully sought to act directly contrary to the Unified Command's endorsed CERA Report without providing a rational explanation for this fundamental change in position.  Such actions risk causing an environmental disaster.

**UNIFIED COMMAND ENDORSED ACTIVITIES: SHEEN SOURCE LOCATION GROUP FINAL REPORT AND THE MIXING MODEL ANALYSIS**

27.

A work group of Taylor Energy and United States scientists formally chartered by the Unified Command, known as the "Sheen Source Location Work Group" ("SSLWG"), conducted a series of comprehensive studies at the MC20 site in early 2017 to identify the source of the surface sheen.

28.

The SSLWG Final Report was provided to the members of the Unified Command, including the Coast Guard, the then-serving FOSC, BSEE and Taylor Energy, on November 17, 2017.  A copy of the SSLWG Final Report is attached hereto as Exhibit "F."

29.

The SSLWG Final Report concludes that the sheen is from remnant oil in the marine sediments on the ocean's floor and that there is no evidence to suggest that a well is presently leaking at the MC20 site.

30.

Several of the key findings of the SSLWG Report are as follows and were accepted by the Coast Guard and then-serving FOSC for the purpose of any further MC20 response activities:

Page 15

"…two distinct acoustic anomaly plumes observed emanating from the vicinity of the containment dome C erosional pit area … within these plumes suggests a pulsating, non-steady-state release."

Page 18

"… they [characteristics of the sheens] are weathered, non-homogeneous… ."

Page 92

"The sheen chemistry indicates mixed sources of weathered oil released from the sediments, not a single homogeneous source."

Page 259

"… the 2017 surface sheens are heterogeneous, do not appear to be from a single oil… ."

Page 333

"… the surface sheens were chemically heterogeneous … one can conclude that the 2017 surface sheens were heterogeneous, like those sheens from 2012/2013."

Page 436

"… the closely spaced plumes … appear to migrate spatially within the erosional pit over a period of days when observed over a one month period."

Page 437

"… these plumes … are temporally varying and spatially meandering within the erosional pit … ."

Pages 500-501

(See the movement of plume source locations and diameters at Figures 8.5.2 and 8.5.3)

Page 659

"The present analysis is to evaluate the potential for these sheens to be generated solely by the release of existing oil contamination in the sediments at the platform location as opposed to ongoing releases from the reservoir through the severed wells"

Page 663

"It is certainly possible that the oil present in the sediment at the MC-20 location can be released intermittently due to buoyancy and pressure variations at the surface leading to sheen observations at the surface and without continued release of oil from the abandoned wells."

*See* Exhibit "F."

31.

Following completion of the SSLWG's studies, the Government, through BSEE,
conducted an independent study, not authorized by the Unified Command, at the MC20 site in
2017, the "BSEE ROV Survey." The results of that study, as presented at a Unified Command
meeting, resulted in findings that were fully consistent with the SSLWG Final Report as to the
seabed location of the primary source for the sheening on the ocean's surface and as to chemical
analysis showing that sheen samples consisted of "weathered" oil.

32.

In response to the Government's question raised at a Unified Command meeting discussing
the SSLWG Final Report and the BSEE ROV Survey, Drs. Richard Camilli and Christopher
Reddy, two members of the SSLWG, did additional work that confirmed and explained the prior
studies.   As part of their assessment, Drs. Camilli and Reddy provided a "mixing modeling
analysis" that concluded with a Summary referencing a "Rum Punch" analogy, stating in part:

> 1. There is no detectable contribution to the sea surface sheen from
> an actively leaking well.  All evidence suggests that the sheen is
> being generated by remnant oil sparged from the sediments within
> the Dome C & D erosional pit.  2. There is no evidence of a worst
> case (or greater) corrosion-induced well leak having occurred during
> the 2012-2017 time period. … 8. Returning to the rum-punch
> analogy, the results of this analysis does not support the scenario
> that "rum" (oil from a leaking well) is being added to the sheen
> source "punch".

A copy of the 2018 Mixing Model Analysis is attached hereto as Exhibit "G."

**DEFENDANTS' WRONGFUL CONDUCT**

33.

As will be shown below, Defendants abruptly departed from their prior policy, taking
agency action that rests on unverified "facts" that directly contradict those contained in the prior

Unified Command's scientific record for the MC20 site, including studies such as the CERA Report, the SSLWG Final Report and Mixing Model Analysis, without an examination of the relevant data, without adequate justification, without proper explanation for their reversal of course and without reasonable notice to Taylor Energy.

## Captain Luttrell's Designation as FOSC

34.

On or about June 15, 2018, Captain Luttrell was designated as the FOSC for the MC20 Incident.  Although Captain Luttrell inherited a situation with a long-documented history, she utterly failed to inform herself of the full administrative record for the MC20 Incident, including the agreements reached through the Unified Command process over a decade and the numerous consensus scientific studies that were endorsed by and performed at the specific direction of the Unified Command and the prior FOSCs.  Captain Luttrell further failed to inform herself of and failed to abide by the agreed upon protocols and procedures of the MC20 Unified Command.  She also failed to follow the practice of all prior members of the Unified Command of being open and transparent in their dealings with each other, which included open communications, acting in a cooperative, joint and collaborative manner, and the sharing of information and data so that only sound science based upon rigorous analysis would guide response efforts and Unified Command decisions on any further actions taken at the MC20 site.

35.

In particular, Captain Luttrell utterly failed to inform herself of (and therefore failed to follow) an agreed upon procedure for the Unified Command's consideration of solicited and unsolicited third-party contractor proposals as established in a document captioned "MC-20 Unified Command Process for Consideration of Solicited and Unsolicited Proposals," which was

approved and executed on August 24, 2016.  A copy is attached hereto as Exhibit "H."  Although Taylor Energy, the Coast Guard and the previous FOSC agreed in writing that this Process would govern the Unified Command's consideration of third-party contractor proposals, Captain Luttrell has arbitrarily and capriciously ignored the Process.  When Taylor Energy brought the agreed upon Process to Captain Luttrell's attention, she claimed no knowledge of it, refused to acknowledge it and would not discuss the matter further.

36.

Captain Luttrell has also repeatedly engaged in actions that are arbitrary, capricious, an abuse of discretion and contrary to law.  Indeed, Taylor Energy fears that her actions may cause an environmental catastrophe.  She has taken final agency action on behalf of the United States that is subject to judicial review by issuance of the Admin. Order and by her denial of Taylor Energy's request for a review and reconsideration of the Admin. Order.  *See* Exhibit "B" at 3.  In addition, Captain Luttrell carried out the Admin. Order by holding the November 2018 UC Meeting, during which third-party contractors made presentations that Taylor Energy and its representatives were precluded from attending.  Following that meeting, Captain Luttrell verbally advised Taylor Energy that she had selected – without Taylor Energy's participation – Couvillion Group, LLC ("Couvillion") as the contractor to design and construct a containment system to address the sheen at the MC20 site.  Captain Luttrell then provided Taylor Energy with only 48 hours to enter into a "take it or leave it" commercial contract with Couvillion, which Taylor Energy would have to privately fund, despite her exclusion of Taylor Energy from attending Couvillion's presentation during the Unified Command meeting and notwithstanding her unwillingness to provide Taylor Energy with a copy of Couvillion's written proposal that had been provided to the Coast Guard and relied upon by Captain Luttrell in carrying out the Admin. Order.  After the

unilateral selection of Couvillion, Captain Luttrell refused to consider or address the written objections and concerns presented by Taylor Energy.  Instead, just one day later, she issued the Notice and the Memo, partially federalizing the response and notifying Taylor Energy that the Coast Guard accepted Couvillion's containment proposal and that the Coast Guard would partially assume response actions that "pertain to all activities related to the development and installation of a containment system; removal and disposal of oil collected in the containment system; and maintenance of a containment system at the MC20 site."  *See* Exhibits "C" and "D."  And, despite Taylor Energy's acknowledged ongoing responsibilities regarding response activities at the MC20 site, Captain Luttrell refused and continues to refuse Taylor Energy's request for copies of the Coast Guard's contract with Couvillion and other relevant information with respect to Couvillion's activities at the MC20 site.

37.

By this Complaint, Taylor Energy seeks judicial review of the Admin. Order (and related letter dated October 25, 2018), and all activities undertaken by Captain Luttrell, as FOSC, and others, under the auspices of the Admin. Order, including the failure to provide Taylor Energy with Constitutionally adequate notice and reasons for proposed actions or a meaningful opportunity to be heard, all contrary to Due Process of Law guaranteed by the Fifth Amendment of the United States Constitution.  In this connection, Taylor Energy seeks judicial review of the denial by Captain Luttrell and the Coast Guard of Taylor Energy's repeated requests for the facts and data upon which the Admin. Order was based, as well as the procedure and process followed by the Coast Guard and Captain Luttrell in their consideration of the contractor proposals, including the selection of Couvillion to design and install the containment system, which work the Admin. Order ordered Taylor Energy to perform, and the contract that the Coast Guard ultimately

entered into with Couvillion.  As set forth more fully below, the Admin. Order and all actions taken by Captain Luttrell pursuant to the Admin. Order should be declared unlawful, vacated and set aside by this Court in the exercise of its judicial review under the APA because they are arbitrary, capricious, constitute an abuse of discretion, and are contrary to law.

## THE ADMIN. ORDER AND DENIAL OF REQUEST FOR RECONSIDERATION

### Issuance of the Admin. Order

### 38.

Without any advance notice, on October 23, 2018, Taylor Energy was served with the Admin. Order executed by Captain Luttrell, which, without explanation, "rescinded and replaced" Admin. Order 12-001.  It "ordered [Taylor Energy] to institute a containment system to capture, contain, and remove oil from the erosional pit near the former Dome C location."  Captain Luttrell also advised Taylor Energy it had only 24 hours to seek "a review and reconsideration" of the Admin. Order and that her "decision upon reconsideration is a final agency action."  *See* Exhibit "B."

### 39.

On October 24, 2018, Taylor Energy timely submitted a written request for a review and reconsideration of the Admin. Order.  *See* Exhibit "I" attached hereto.  This formal request was summarily denied by Captain Luttrell in her letter dated October 25, 2018.  *See* Exhibit "J" attached hereto.

### 40.

The Admin. Order and the related letter denying Taylor Energy's request for a review and reconsideration, as well as the actions taken by the Coast Guard and Captain Luttrell in accordance

with the Admin. Order, constitute a "final agency action" within the meaning of 5 U.S.C. § 706.

41.

The Admin. Order stated that "[r]ecently developed information related to source location and conditions at the MC20 site, combined with a review of previously existing information, warrant issuance of this new administrative order."  Captain Luttrell further stated that "it is the federal position that:

1.  One or more wells are actively discharging oil and gas from the erosional pit near the former Dome C location.

2.  The worst-case estimate of the daily volume of release far exceed previous estimates and is in the order of hundreds of barrels per day.

3.  Temporary containment and recovery of oil being discharged at the erosional pit near the former Dome C location is needed and feasible while a more permanent solution to stopping the source is developed."

*See* Exhibit "B."

42.

The Admin. Order notified Taylor Energy that a Unified Command meeting would be held from November 6-9, 2018 "for the purpose of evaluating containment and recovery systems and developing an implementation plan and timeline."  The Admin. Order stated that a "workshop" would be held during the Unified Command meeting "to evaluate proposals from potential contractors on the design of an effective containment system" and directed Taylor Energy "to conduct new market research prior to the November Unified Command meeting and make arrangements with potential contractors to provide an overview of potential designs and service based on the attached documentation."  The Admin. Order also stated that:

The containment system must eliminate the surface sheen and avoid the deficiencies associated with prior containment systems.  Design

> of the containment system shall take into consideration the site conditions provided to you.  The containment system shall be designed to contain an amount with a worst case daily discharge between 250 barrels and 700 barrels per day.  A design of a minimum of 250 barrels per day is acceptable at this time.

The Admin. Order also represented to Taylor Energy that, "[b]y the conclusion of the Unified Command meeting, 06-09 November, **WE** will select one of the proposals presented during the workshop."  *See* Exhibit "B" (emphasis added).

### 43.

Although the Coast Guard failed to provide Taylor Energy with any advance notice of its about-face as set forth in the Admin. Order and provided Taylor Energy with only 24 hours to seek reconsideration of it, the Admin. Order threatened Taylor Energy with substantial potential penalties, indicating that the "failure to properly carry out the removal actions as ordered . . . may subject" Taylor Energy "to a civil penalty of up to $40,000 per day of violation or up to three (3) times the cost incurred by the Oil Spill Liability Trust Fund."  *See* Exhibit "B" at 2.

### 44.

The Admin. Order further provided that it was "effective upon receipt [i.e. October 23, 2018] and remained in effect until rescinded by" Captain Luttrell's office.  It also provided that "[f]ailure to comply with the requirements of this Administrative Order may result in the federal government assuming full or partial control of the activities described in this Administrative Order and subsequent removal actions deemed necessary by the Federal On Scene Coordinator."[3]

---

[3] Although partial or full federal assumption would result in the loss of control by Taylor Energy over the response activities subject to the assumption, those activities would remain at Taylor Energy's expense.

45.

The documents accompanying the Admin. Order only provided a selective interpretation of some data and a self-serving unverified "summary" of findings without providing complete reports, information or any of the underlying facts and data to support the conclusions set forth in the Admin. Order.  For example, although the Admin. Order relies upon an eight-day underwater survey undertaken by BSEE and NOAA, the Order includes only a cursory summary of its analysis, and the Government refused and continues to refuse to provide this survey to Taylor Energy.  Instead, in the documents accompanying the Admin. Order, the Coast Guard provided Taylor Energy with a single ROV sonar screen image and two short edited video clips that total approximately 2.5 minutes of the eight-day survey.  The Coast Guard and Captain Luttrell also refused to provide Taylor Energy with the "X" and "Y" coordinates for the location where the containment system is to be installed.

46.

The documents accompanying the Admin. Order reference a study by Oscar Pineda-Garcia ("the Garcia theory"), stating that the results of the study "indicate that the estimated minimum daily volume discharge [from the MC20 site] is 249 barrels with an estimated maximum of 697 barrels per day."  While the conclusions in the Admin. Order center, in large part, on the "shock value" and sensationalism of the Garcia theory, it was not a study conducted, coordinated or authorized by the Unified Command.  Nor was it verified or peer reviewed.  In fact, Taylor Energy was completely unaware that the Coast Guard, the FOSC and/or the Unified Command intended to rely on the Garcia theory until it was first disclosed and identified in the Admin. Order.

47.

Rather than being a product of the Unified Command's longstanding response efforts based on sound science and sound scientific evaluation, the Garcia theory, which forms the predominant basis for the Admin. Order, was developed by a Government-paid expert witness for strategic litigation purposes in connection with a lawsuit between Taylor Energy and the Department of the Interior pending in the United States Court of Federal Claims.   The Department of Justice submitted the Garcia theory in the Court of Federal Claims litigation as an attachment to a brief in opposition to a motion filed by Taylor Energy.   As such, it has never been accepted as legitimate evidence in any judicial proceeding, and its author has never been challenged, much less recognized, as an expert through a *Daubert* proceeding.   Thus, because it was prepared solely for litigation purposes – rather than for purposes of the MC20 response – the predominant basis for the Admin. Order, the Garcia theory, was not developed or studied under the Unified Command structure and further was not based on verified scientific information that had been vetted through the Unified Command structure.   The untested and unverified conclusions set forth in the Garcia theory directly contradict the prior facts related to the conditions at the MC20 site that were developed through over a decade of extensive study performed at the direction of the Unified Command.

48.

Although the Garcia theory, which was filed by the Department of Justice in the Court of Federal Claims litigation on September 14, 2018, had been available to the Coast Guard for over a month, if not before then, the Coast Guard waited to issue the Admin. Order until October 23, 2018.  In fact, despite the Garcia theory's warning that the "worst-case estimate of the daily volume release" from the MC20 site "far" exceeds "previous estimates" and "is in the order of hundreds

of barrels per day," *see* Exhibit "B" at 1, the Coast Guard did not act on it immediately, thus failing to find that it presented any imminent and substantial threat to the public health or welfare.  Instead, the Coast Guard issued the Admin. Order only after a front-page news article appeared in the *Washington Post* that reported the Garcia theory's unverified conclusions to the public and questioned the Coast Guard's competence in supervising the MC20 response.

### Denial of Taylor Energy's Request for Reconsideration

49.

In its written request for review and reconsideration, Taylor Energy asked that the FOSC provide it with the records, raw data and methods applied in the interpretation of the "recently developed information" that Defendants had relied upon as the basis for issuance of the Admin. Order.  *See* Exhibit "I."  Taylor Energy expressly made the point that the Coast Guard's failure to disclose this response-related information directly conflicted with assurances made by the previous FOSC and Coast Guard Admiral Paul Thomas that the Coast Guard and the FOSC would provide Taylor Energy with all data, information, interpretations and surveys that would be used as part of the Unified Command's response to the MC20 Incident.  Due to this failure to disclose, Taylor Energy asserted that the Admin. Order was at best premature given that Taylor Energy had not had an opportunity to review and consider the underlying facts and data.  Taylor Energy additionally pointed out for the Coast Guard's consideration specific inconsistencies between the purported scientific support for Admin. Order and the scientific conclusions contained in the Unified Command's longstanding administrative record and provided the FOSC with supporting documentation from the administrative record that established those inconsistencies.  *See* Exhibit "I."

50.

As part of its request for review and reconsideration, Taylor Energy asked Captain Luttrell to postpone the Unified Command meeting set for November 6-9, 2018, until after a full disclosure of the information had been provided and Taylor Energy had been afforded time to review it. Following a proper review period, Taylor Energy recommended that the Unified Command set a meeting for purposes of allowing a presentation by the Government's experts, followed by a peer review by Taylor Energy's scientific experts "to validate the information and establish the facts as supported by the full Unified Command record." *See* Exhibit "I."

51.

One day later, Captain Luttrell denied Taylor Energy's request for reconsideration of the Admin. Order. The FOSC's letter also denied Taylor Energy's request for the data and facts upon which the Admin. Order was based and directed Taylor Energy to comply with the other instructions and requirements of the Admin. Order or face "federalization." *See* Exhibit "J."

52.

The FOSC's letter further denied Taylor Energy's request to reschedule the November 6-9, 2018 Unified Command meeting. Captain Luttrell threatened, "if TEC [Taylor Energy] fails to attend the November 6-9, 2018 Unified Command, I will deem this as non-compliance with the Order and proceed with issuance a Notice of Federal Assumption (NOFA)." *See* Exhibit "J."

53.

All of the foregoing actions are arbitrary, capricious, contrary to law, and constitute an abuse of discretion.

<u>**UNIFIED COMMAND MEETING HELD NOVEMBER 6-9, 2018**</u>
<u>**AND CONTRACTOR PRESENTATIONS AND SELECTION**</u>

54.

Taylor Energy acknowledged receipt of Captain Luttrell's letter and advised that Taylor Energy remained committed to working with the Coast Guard in the Unified Command structure. *See* Exhibit "K" attached hereto.  In accordance with the Admin. Order, Taylor Energy advised the FOSC that it was in the process of contacting multiple contractors to submit proposals.  Taylor Energy further advised that, in contacting contractors, it had learned that the Coast Guard had been contacting some of the same contractors with the same request.  Given the limited amount of time before the November 6, 2018 meeting, Taylor Energy requested that the FOSC coordinate the Coast Guard's efforts with Taylor Energy's efforts to obtain the proposals in a coordinated and jointly managed manner.  Captain Luttrell refused.

55.

Taylor Energy also reiterated its request for the records, the raw data and methods applied in interpretation of the science that was relied upon to support issuance of the Admin. Order.  It explained its need for this information, emphasizing that its "ability to perform is enhanced by continuing to share scientific data" and that, without review of this information, Taylor Energy's "ability to continue to act as the Responsible Party for the MC20 Response is being severely prejudiced."  *See* Exhibit "K."

56.

The next day, the FOSC denied Taylor Energy's request for data and information and further advised:  "We are unable to provide additional records, raw data and interpretation at this time."  *See* Exhibit "L" attached hereto.

57.

With respect to Taylor Energy's request to coordinate contractor proposals, the FOSC responded that the Coast Guard had "been advised that under Procurement Integrity Act, 41 USC 423," it was "unable to release the names of the contractors that provide us with proposals."  The FOSC added that the Coast Guard had sent out a solicitation for proposals to 104 of the Coast Guard's "Basic Ordering Agreement (BOA) contractors" and that the Coast Guard anticipated receiving approximately 4-6 proposals for federal consideration.  *See* Exhibit "L."

58.

By correspondence dated November 5, 2018, Taylor Energy complied with the Admin. Order's directives, providing the FOSC with copies of two written proposals.  One of these proposals included utilizing the containment domes Taylor Energy had previously constructed in accordance with Administrative Order 12-001.  Taylor Energy requested that the Coast Guard and FOSC "[p]lease reciprocate by providing the USCG contractor presentations that will be presented on November 6th and 7th."  *See* Exhibit "M" attached hereto.  After the FOSC's representative confirmed receipt of Taylor Energy's technical proposals, the FOSC denied Taylor Energy's request for copies of the contractor presentations that the Coast Guard had received, stating: "[u]nfortunately, under the Procurement Integrity Act…I am unable to provide our Federal presentations to you.  I am also unable to release the names of companies providing presentations to the Federal government.  I can offer that the USCG request for proposals was sent out to our 104 BOA Contractors, and that this law does not preclude you from talking to our contractors should they choose to reach out to you."  *See* Exhibit "N" attached hereto.

59.

But the Procurement Integrity Act does <u>not</u> apply to a situation in which the Government directs a non-governmental entity, like Taylor Energy, to enter into a contract with another private party. The FOSC's refusal to provide Taylor Energy with the names and presentations of the potential contractors thus was baseless, contrary to law and in disregard of Taylor Energy's right to participate in the contractor selection process.

60.

Captain Luttrell also arbitrarily and unilaterally convened the November 2018 UC Meeting. Captain Luttrell's setting of the meeting date and refusal to postpone it, as well as her threat to federalize the response, forced Taylor Energy to attend sessions without its usual legal counsel, its full spill management team or its scientific consultants.

61.

At the select sessions of the Unified Command meeting that it was allowed to attend, Taylor Energy formally objected to the FOSC's arbitrary, capricious and unlawful actions and the violation of Taylor Energy's legal rights, including Taylor Energy's Constitutional due process rights. Taylor Energy further objected to the Admin. Order and the scheduling of the Unified Command meeting without proper and reasonable notice, as well as the denial of Taylor Energy's ability to review, in advance, any and all contractor proposals that were to be considered by the Unified Command. Taylor Energy also objected to the FOSC's exclusion of Taylor Energy from attending and participating in the "workshop" sessions where the Coast Guard and FOSC received, reviewed and evaluated the various contractor presentations. Taylor Energy additionally reiterated its formal objection to the Admin. Order because it relied upon "science" that the Unified Command's Environmental Unit Leader characterized as "fundamentally flawed." Taylor Energy

further reiterated its objection that consideration of the issues raised in the Admin. Order was contrary to the MC20 Incident Action Plan for the Fourth Quarter of 2018.

62.

Taylor Energy further objected to the Admin. Order because the underlying facts and data supporting the Admin. Order had not been provided to Taylor Energy, contrary to the commitment made by Admiral Thomas and despite Taylor Energy's specific requests.  In response to Taylor Energy's objection, Captain Luttrell concluded, without explanation, that the data was "not pertinent."  When questioned, Captain Luttrell refused to even discuss or explain why she believed that the requested information was not pertinent and would not explain why she was refusing to provide the underlying scientific data for Taylor Energy's evaluation and review.  All of these actions are inconsistent with the National Contingency Plan and are in violation of Taylor Energy's Constitutional rights.  *See, e.g.*, 32 U.S.C. § 2702(b)(1)(B); 40 C.F.R. §300.305 (the National Contingency Plan generally obligates an FOSC to involve a responsible party in response actions).

63.

After the morning sessions of the November 6, 2018 Unified Command meeting, Taylor Energy and its representatives were directed by Defendants to leave the premises so that the Coast Guard and Captain Luttrell could hear and attend various contractor presentations.  The exclusion of Taylor Energy from the contractor presentation sessions was baseless, an abuse of discretion, and also violated the Unified Command protocol and process as approved in the "Process for Consideration of Solicited and Unsolicited Proposals."  *See* Exhibit "H."

64.

After Taylor Energy presented its two contractor proposals for the most effective proposed containment system design, Captain Luttrell and the Coast Guard excluded Taylor Energy from any further discussions or deliberations on the selection of a contractor.  The exclusion of Taylor Energy from the contractor-selection process was contrary to the express terms of the Admin. Order, which stated that, "[b]y the conclusion of the Unified Command meeting…**WE** will select one of the proposals presented during the workshop."  Exhibit "B" at 2 (emphasis added).  The Unified Command, at the direction of Captain Luttrell, therefore did not engage in a joint and collaborative decision to select a contractor.

65.

On the afternoon of November 9, 2018, Captain Luttrell verbally advised Taylor Energy that she had unilaterally selected Couvillion as the contractor under the Admin. Order.  Despite Taylor Energy's exclusion from the contractor presentations and its lack of knowledge of any details concerning Couvillion's or the other contractors' proposals, Captain Luttrell informed Taylor Energy that it would have only 24 hours to execute a "take it or leave it" contract with Couvillion.  Even with a subsequent extension of this time period to 48 hours, it remained unreasonable and deprived Taylor Energy of a fair opportunity to study Couvillion's proposal and to negotiate a commercially reasonable contract.  Such actions were unreasonable and a violation of Taylor Energy's legal rights.

## FLAWED CONTRACTOR SELECTION PROCESS, SELECTION OF COUVILLION AND NOTICE OF FEDERAL ASSUMPTION

66.

The FOSC instructed Taylor Energy to appear at the Coast Guard Sector New Orleans office on the afternoon of Tuesday, November 13, 2018 to attend a presentation by Couvillion, limited to only forty minutes, as the already selected contractor. Based on discussions with the FOSC and the Coast Guard, Taylor Energy understood that it was going to be presented with details on Couvillion's contract as a "take it or leave it" proposition. At the outset of the meeting, Taylor Energy requested a copy of the proposed contract. Neither Defendants nor Couvillion, however, had prepared a draft contract for Taylor Energy's review and consideration. Nor did Couvillion have a detailed scope of work or any specifics in terms of the timing, pricing, identity and availability of subcontractors capable of performing the work, insurance, or any other specific commercial or legal terms. Nevertheless, Captain Luttrell verbally advised that Taylor Energy had until 5:00 p.m. on Thursday, November 15, 2018 to execute the yet-to-be-seen contract with Couvillion.

67.

Thereafter, Taylor Energy, at Couvillion's request, provided its standard draft master service agreement. Couvillion responded the next morning with its proposed form contract, including a proposed scope of work. Couvillion subsequently provided a proposed escrow agreement that required Taylor Energy to deposit five million dollars "in escrow" within 24 hours of contract execution to be used to compensate Couvillion. The scope of work and other contract materials proposed by Couvillion provided Taylor Energy with no meaningful rights or protections and failed to afford Taylor Energy any rights to verify or ensure proper performance of the work. They further provided Taylor Energy with no rights in terms of the verification of invoices or the

release of its funds for payment of any services provided.  Despite this extreme one-sidedness,
Taylor Energy continued its efforts to conclude a commercially reasonable contract by the
November 15, 2018 5:00 p.m. deadline unilaterally set by Captain Luttrell.

### 68.

Taylor Energy advised Captain Luttrell and Couvillion shortly before the deadline that,
given the time constraints and other limitations resulting from the process undertaken, Taylor
Energy was unable to execute a contract with Couvillion by the 5:00 p.m. deadline.  *See* Exhibit
"O" attached hereto.  Taylor Energy further advised the Coast Guard and Couvillion that it
remained willing to work on an appropriate containment solution, including, if necessary, entering
into a commercially reasonable contract with Couvillion, notwithstanding Taylor Energy's
objections to the overall process dictated by Captain Luttrell.

### 69.

Additionally, Taylor Energy advised that it had serious concerns regarding Couvillion's
qualifications and the unreasonable and unconventional contract terms proposed by Couvillion,
including the lack of any terms that provided Taylor Energy with any protections or verification
procedures related to Couvillion's performance.  Taylor Energy additionally provided a detailed
recitation of its additional justifications for refraining from executing the Couvillion contracts as
presented, including the failure to disclose the process by which Captain Luttrell and the Coast
Guard considered and evaluated the contractors' proposals, the exclusion of Taylor Energy from
the contractor selection process, the failure to follow the MC20 Unified Command Process for
Consideration of Solicited and Unsolicited Proposals, and the deprivation of Taylor Energy's right
to negotiate a commercially reasonable contract.  *See* Exhibit "O."

70.

Notwithstanding the November 15, 2018 deadline, Taylor Energy diligently continued its effort to negotiate a commercially reasonable contract with Couvillion and forwarded updated drafts of proposed contract agreements for Couvillion's consideration.  On November 16, 2018, Couvillion advised Taylor Energy that it was unwilling to agree to Taylor Energy's proposed contract changes.  By email message sent by Captain Luttrell on November 16, 2018 at 4:31 p.m., Captain Luttrell forwarded to Taylor Energy the Notice (Exhibit "C") and the Memo (Exhibit "D").

71.

In the Notice, Captain Luttrell advised that effective November 16, 2018 at 1700 CST the Coast Guard will "partially assume response actions" pertaining "…to all activities related to the development and installation of a containment system; removal and disposal of oil collected in the containment system; and maintenance of a containment system at the MC20 site, as identified in Administrative Order 19-001."   Exhibit "C."   Captain Luttrell further advised that:   "Federal assumption does not relieve you of your financial responsibilities and your obligation to abate the source of the discharge.  Taylor Energy Company's requirement to conduct overflights and respond to recoverable oil remains."  Exhibit "C."

72.

On November 20, 2018, Taylor Energy acknowledged receipt of the Notice issued by Captain Luttrell.  *See* Exhibit "P" attached hereto.  Taylor Energy then formally requested that the FOSC: (A) provide Taylor Energy with a complete copy of the executed contract between the Coast Guard and Couvillion, including all exhibits, scopes of work, attachments, etc.; (B) copy Taylor Energy on all communications between the Coast Guard and Couvillion related to performance of the contract in light of the Notice's statement that Taylor Energy was not relieved

of its additional response obligations and financial responsibilities; (C) provide Taylor Energy with a copy of the PowerPoint presentation made by Couvillion on November 13, 2018; and (D) provide the support, including written documentation and legal authority, that allegedly authorized Couvillion to use Taylor Energy's property, as Couvillion had indicated in its proposal that it intended to recover and reuse Taylor Energy's equipment related to its existing subsea containment system.  *See* Exhibit "P."

73.

In response, Captain Luttrell unjustifiably denied Taylor Energy's formal requests in direct contravention of previously agreed upon procedures and protocols.  *See* Exhibit "Q" attached hereto.  Indeed, rather than cooperating and assisting Taylor Energy in its ongoing response efforts and facilitating Taylor Energy's efforts to comply with the Admin. Order and the Notice by keeping Taylor Energy informed of Couvillion's activities, Captain Luttrell informed Taylor Energy that she would not comply with any of the requests.

74.

As of the date of the filing of this Complaint, Taylor Energy has fully complied with the Admin. Order.

## COUNT I

## DENIAL OF PROCEDURAL DUE PROCESS OF LAW

75.

The allegations of paragraphs 1 to 74 are adopted as if copied herein *in extenso*.

76.

Under the Due Process Clause of the Fifth Amendment to the United States Constitution and under the Administrative Procedure Act, 5 U.S.C. § 706, Taylor Energy is entitled to and is guaranteed due process of law and procedural safeguards <u>before</u> it can be deprived of protected property rights.  Taylor Energy's constitutionally protected property rights and interests include, but are not limited to, its role and rights as the designated "Responsible Party" for the MC20 Incident under the National Contingency Plan, including its prior funding of all of the numerous scientific studies and response efforts at the request of the Unified Command, and its financial responsibility and legal exposure for any damage to the environment or otherwise for activities undertaken at the MC20 site, including response actions undertaken pursuant to the directives of the FOSC and the Unified Command.  Taylor Energy also is subject to claims of the United States for civil penalties, payment of response costs and/or expenses related to implementation of the Admin. Order and the Notice, including Captain Luttrell's selection and designation of Couvillion as the containment contractor and the Coast Guard's entry into a contract with Couvillion for that purpose.

77.

The actions and procedures taken and followed by the Coast Guard and Captain Luttrell completely deprived Taylor Energy of its Constitutional right to due process of law, were inadequate by Constitutional standards, and deprived Taylor Energy of a Constitutionally fair and adequate administrative process to receive reasonable notice of the Admin. Order, to be heard with respect to its questions and challenges to the infirmities and factual inaccuracies contained within the Admin. Order, to discover, evaluate and have adequate notice of the data and facts upon which the Admin. Order was based, and to comply with the Admin. Order's directives.

78.

The process by which the Admin. Order was developed and issued deprived Taylor Energy of its due process rights as a member of the Unified Command and as the Responsible Party for the MC20 incident.  It was given no advance notice of the Admin. Order nor of any scientific studies that purportedly would provide the basis for the Coast Guard's complete reversal of course and its decision to supersede Admin. Order 12-001.  In fact, the conclusions set forth in the Admin. Order rely on incomplete, preliminary and flawed scientific studies that contradict pre-existing MC20 Unified Command scientific studies and that were not subject to appropriate peer review and did not undergo any evaluation or review under the Unified Command process.  The Admin. Order was not based upon scientific studies that had been endorsed by and undertaken through the Unified Command, but rather was based on an unverified theory unilaterally and covertly developed by a Government-paid expert witness at the instruction of the Department of Justice in connection with separate litigation between Taylor Energy and the Department of the Interior, all contrary to the Unified Command structure and the National Contingency Plan.  *See* 32 U.S.C. § 2702(b)(1)(B); 40 C.F.R. §300.305.

79.

Taylor Energy was deprived of due process of law by Captain Luttrell and the Coast Guard by their refusal and failure to provide Taylor Energy with the data and facts relied upon as the basis for the Admin. Order, including all data and scientific studies that allegedly support the conclusions in the Admin. Order and the "X" and "Y" coordinates of the location of the source of the surface sheen, which information is fundamental to the design and installation of the containment system that the Coast Guard ordered Taylor Energy to put in place pursuant to the Admin. Order.  Accordingly, Captain Luttrell and the Coast Guard failed to provide Taylor Energy

an administrative process by which it could obtain the data and facts that it and its technical consultants needed to comply with the Admin. Order.

80.

The actions of the Coast Guard and Captain Luttrell in issuing the Admin. Order, in the scheduling and conducting of the November 2018 UC Meeting, in soliciting and evaluating the contractors' proposals, in excluding Taylor Energy, a participating member of the Unified Command, from the contractor presentation meetings, in unilaterally selecting Couvillion to carry out containment work, and in the issuance of the Notice and the Memo, all violated Taylor Energy's Constitutional right to due process of law and deprived Taylor Energy of its protected property rights.

81.

In addition, pursuant to Admin. Order 12-001, which the Coast Guard did not rescind until issuance of the Admin. Order on October 23, 2018, Taylor Energy, as a fully cooperative responsible party, complied with its directives at significant expense.

82.

Taylor Energy was deprived of due process of law when Captain Luttrell refused to postpone the November 2018 UC Meeting until after Taylor Energy had been provided with all data and facts relied upon to support the Admin. Order. Further, during the course of the November 2018 UC Meeting, Captain Luttrell refused to answer or address Taylor Energy's questions and stated that the data requested by Taylor Energy was "not pertinent" to her decision as FOSC.

83.

Accordingly, Taylor Energy was deprived of due process of law by Defendants' abrupt reversal of their prior policy position and thereby suffered substantial harm.  In issuing the Admin. Order and implementing it:

(A)     The FOSC – apparently in reaction to a news article published one day earlier – issued the Admin. Order without adequate notice to Taylor Energy and without providing Taylor Energy with a meaningful opportunity to review and comment on the findings on which the Admin. Order was based.  Although observed conditions at the MC20 site remained unchanged and notwithstanding that the Coast Guard had failed to identify or notify Taylor Energy of any adverse change at the site, the FOSC failed to provide Taylor Energy with any procedural protections before issuance of the Admin. Order and failed to provide adequate justification for its issuance.

(B)     In issuing the Admin. Order and providing Taylor Energy with only 24 hours to seek reconsideration of it, the FOSC failed to provide Taylor Energy with reasonable and sufficient time to address the agency's decision to reverse course on its longstanding position in contravention of the facts developed by extensive scientific study and without proper regard for the caution that must be exercised to prevent adverse environmental consequences when conducting response activities at the MC20 site.

(C)     The FOSC refused to provide Taylor Energy with the contractors' proposals.  This refusal directly contravened the written protocols and process developed collaboratively by the Unified Command for receiving and reviewing contractor solicitations.  *See* Exhibit "H."

(D)     The FOSC provided Taylor Energy with less than 48 hours to execute a "take it or leave it" contract with Couvillion and refused to provide Taylor Energy with reasonable and sufficient time to negotiate a commercially reasonable contract. This was followed by Captain Luttrell's immediate and unilateral issuance of the Notice and the Memo, which also failed to afford Taylor Energy due process of law.

(E)     The FOSC failed to follow the agreed to and established protocol of the National Contingency Plan, *see, e.g.*, 32 U.S.C. § 2702(b)(1)(B); 40 C.F.R. §300.305, and the Unified Command structure and instead followed the directions of the Department of Justice as part of its strategy in separately pending litigation.  Such departure is a gross violation of Taylor Energy's due process rights.

(F)     Subsequent to the issuance of the Notice and the Memo, the FOSC denied Taylor Energy's request for a copy of the Couvillion contract and other information related to Couvillion's performance at the MC20 site.  By depriving Taylor Energy of the requested information, Defendants have actively sought to frustrate Taylor Energy's efforts to comply with the Admin. Order and the Notice and have deprived Taylor Energy of its right to be kept reasonably informed of the activities and communications taking place between Defendants and Couvillion in connection with the MC20 site;

(G)     In disregard of Taylor Energy's full participation in and cooperation with the Unified Command process for over a decade, as well as Taylor Energy's expenditure of hundreds of millions of dollars out of its own pocket at the direction

of the prior FOSCs, Defendants unilaterally eliminated Taylor Energy from participation in the Unified Command decision-making process.

(H)    Despite Taylor Energy's longstanding participation in the selection of the best-suited and most capable contractors to perform technical and scientific studies and surveys and response activities at the MC20 site and notwithstanding Taylor Energy's extensive knowledge of the prior scientific record and the environmental risks and dangers posed by undertaking work at the MC20 site without adequate preparation and a full briefing on the relevant information, Defendants excluded Taylor Energy from the "Technical Review Team" that selected the Couvillion proposal, which team had limited, if any, knowledge or understanding of the historic MC20 Unified Command administrative record.

84.

As will be shown at trial of this matter, the process and procedure followed by Captain Luttrell and the Coast Guard violated Taylor Energy's constitutionally protected due process right to be fairly heard and deprived Taylor Energy of protected property rights without due process of law.  Defendants' conduct is Constitutionally infirm and caused Taylor substantial harm for at least the following reasons.  In issuing the Admin. Order and implementing it:

(A)    Lack of Neutral Decision Maker:  The United States, acting by and through the Coast Guard and the FOSC, is responsible for enforcement of the Oil Pollution Act. The Coast Guard and the FOSC, by failing to apprise themselves of the MC20 Unified Command administrative record, as well as the joint and collaborative studies and protocols undertaken by the Unified Command over a decade, including the technical studies of the CERA, SSLWG, and the Mixing Model Analysis, acted

prematurely and were not neutral decision-makers.  Defendants blatantly failed to act consistently with the administrative record and sound science;

(B)  <u>Lack of Adequate Notice</u>:  Taylor Energy was not given adequate notice of the Admin. Order, including the grounds for its conclusions and the supporting data and facts that form the basis for the Admin. Order.  Defendants did not follow the agreed upon procedures and protocols of the Unified Command and based the Admin. Order on scientific studies that had not been commissioned or endorsed by the Unified Command.  Nor did the FOSC disclose to Taylor Energy her intent to rely on external studies to arrive at decisions under the Unified Command process. After the FOSC disclosed reliance on the studies by issuance of the Admin. Order, Captain Luttrell and the Coast Guard denied Taylor Energy's request for the facts and data underlying the studies.  Thus, Taylor Energy was not afforded any procedure or process whereby it could be informed of the basis of the Admin. Order and under which it could be afforded the opportunity to study and evaluate the unverified theory and data that the FOSC had relied upon as support for the Admin. Order.  This denial deprived Taylor Energy of its right to meaningfully participate and engage in coordinated response activities at the MC20 site and departed from the Unified Command's longstanding prior practice of basing its decisions only upon "best science" principles.  Finally, Defendants refused to provide Taylor Energy with the reason for their rescission of Admin. Order 12-001 and denied Taylor Energy the right to participate in the contractor solicitation and selection process;

(C)     <u>No Opportunity to Present Reasons Why the Proposed Action Should Not Be</u> <u>Taken</u>: Defendants denied Taylor Energy the data and facts upon which the Admin. Order was based and denied Taylor Energy the opportunity to participate in and ask questions during the contractor presentations. Further, Captain Luttrell unilaterally selected a contractor, without consulting with Taylor Energy, which further denied Taylor Energy the opportunity to be present and participate in the decision-making for appropriate MC20 response actions;

(D)     <u>The Right to Call Witnesses and Be Heard</u>: Defendants refused to provide a fair and adequate administrative process related to the Admin. Order whereby Taylor Energy would have a meaningful opportunity and fair ability to present contemporaneous and live commentary from Taylor Energy's technical consultants;

(E)     <u>The Right to Have a Decision Based on the Evidence Presented</u>: Defendants denied Taylor Energy access to facts and data and therefore deprived Taylor Energy of its right to present scientific facts and data in rebuttal of the unverified theory and data cited as support for the Admin. Order.  The administrative process followed by Captain Luttrell was directly contrary to the process followed by all prior FOSCs and did not afford Taylor Energy the opportunity to challenge incorrect and misleading facts asserted in the documentation submitted in support of the Admin. Order or the opportunity to point out the overwhelming sound scientific evidence in the MC20 Unified Command administrative record that contradicts the unverified scientific basis for the Admin. Order;

(F)     The Right to Know the Evidence against Taylor Energy:  Defendants deprived

Taylor Energy of relevant and material information, including raw data gathered by

the Government's consultants, so that Taylor Energy's technical consultants could

evaluate that data in the context of the extensive prior scientific record.

Accordingly, Defendants deprived Taylor Energy of the ability to defend itself from

Defendants' action;

(G)     The Right to Counsel: Defendants deprived Taylor Energy of the opportunity to

have counsel present and reasonably participate in the contractor presentation

process overseen by Captain Luttrell under the Admin. Order;

(H)     The Making of a Record:  The FOSC failed to reasonably educate herself on the

past activities and decisions of the MC20 Unified Command, disregarded the

established Unified Command structure and procedures for conducting Unified

Command meetings as established by the National Contingency Plan and excluded

Taylor Energy from participating in the contractor presentations and "workshop,"

contrary to the agreed upon procedure for receiving contractor solicitations.

Defendants also failed to provide Taylor Energy with the identities of the

contractors from which proposals were solicited nor was Taylor Energy provided

with the proposals that Defendants received and evaluated from the bidding

contractors.  Defendants arbitrarily excluded, discounted or refused to consider the

lengthy MC20 Unified Command administrative record, administrative

documentation on the response and results of consistent scientific studies related to

response and containment solutions.  Moreover, Defendants failed to create and

maintain a proper and full administrative record following the time that the Unified Command was "reconstituted" during mid-2018; and

(I)     A Statement of Reasons:   Taylor Energy has not been provided with a Constitutionally adequate statement of reasons concerning Captain Luttrell's selection of Couvillion.  Indeed, Defendants promised to provide, but have now refused to provide, the "scoring sheets" allegedly supporting the selection of Couvillion.  Instead, the Memo contains only *post hoc* self-serving statements to support the selection of Couvillion, which are not based on and indeed are contrary to the MC20 Unified Command administrative record.  The selection of Couvillion and the FOSC's procedures following that selection did not result from transparent Unified Command activities and decisions.

85.

In accordance with the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706, the Admin. Order, the Notice, and the other actions of Defendants thereunder are unlawful and should be vacated and set aside, as they violated Taylor Energy's Constitutionally protected right to due process of law.

## COUNT II

## REQUEST TO VACATE THE ADMIN. ORDER AND ALL ACTIONS TAKEN THEREUNDER

86.

The allegations of paragraphs 1 to 74 are adopted as if copied herein *in extenso.*

87.

Under 5 U.S.C. § 706, the Court is granted broad authority to review a final agency action. Specifically, it can decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of the agency actions.  The Court also has the legal authority to order and compel agency action that is unlawfully withheld or unreasonably delayed; to hold unlawful and set aside agency action, findings and conclusions determined to be arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law; contrary to a constitutional right, power, privilege, or immunity; or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law; unsupported by substantial evidence; and unwarranted by the facts.

88.

The Coast Guard has expressly stated that the Admin. Order, upon reconsideration "is a final agency action."  Exhibit "B" at 3.  In accordance with 5 U.S.C. § 706, the Court should vacate the Admin. Order, and all actions taken thereunder, including the selection of Couvillion as a contractor, any contract(s) between Couvillion and the Coast Guard arising out of the Admin. Order, the Notice, the Memo and any related actions, findings and conclusions of Captain Luttrell and the Coast Guard in implementing the Admin. Order, all as being arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

89.

Defendants' abrupt reversal of the Unified Command's prior policy and contradictory scientific basis as set forth in the Admin. Order, the selection of Couvillion, the Notice, and the Memo are unlawful and all actions by Defendants taken pursuant thereto should be set aside,

vacated and found to be arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law and to have caused Taylor Energy substantial harm for the following reasons:

(A)     The Admin. Order is based upon certain unverified studies, not undertaken or endorsed by the Unified Command and not supported by the MC20 administrative record.  Rather, the Admin. Order and related actions are based on work performed by a Government-paid expert witness for purposes of a separate lawsuit between Taylor Energy and the Department of the Interior.   The conclusions of this individual were filed as an exhibit to a pleading in that separate litigation pending in the Court of Federal Claims.  His opinions as to the estimated volumes and other conclusions are not based on sound scientific principles and are fundamentally flawed.  And, the Defendants' refusal to provide to Taylor Energy the raw data and facts underlying this expert witnesses' opinion has prevented Taylor Energy from fairly assessing, let alone challenging those opinions that are, in large part, the basis for the Admin. Order.

(B)     Prior to the issuance of the Admin. Order, there was no scientific evidence in the studies conducted under the auspices of the Unified Command to support the conclusion that the surface sheen at the MC20 site resulted from an ongoing or active leak from "one or more wells of Taylor Energy."  To the contrary, the 2018 Mixing Model Analysis presented to the Unified Command established that "there is no detectable contribution to sea surface sheen from an actively leaking well" and that "if a well is actively leaking and contributing to the sheen, its flow rate is below detection limits and contributes, on an average, less than 2.4 gallons per day (+/- 1.2 GPD)."  *See* Exhibit "G."

(C)     The Admin. Order ignored over a decade's worth of comprehensive, consensus and sound science and other work developed in the MC20 Unified Command administrative record such as the CERA Report and the SSLWG Final Report.  In fact, Taylor Energy worked cooperatively with the five previous FOSCs under agreed upon procedures and protocols following best science principles.  Captain Luttrell's Admin. Order radically departs from these conclusions and has no rational connection to the full MC20 administrative record and is, therefore, illegal.

(D)     The Admin. Order also partially relies upon a NOAA BSEE survey undertaken in 2018.  Captain Luttrell and the Coast Guard have withheld the full survey data from Taylor Energy and instead have provided Taylor Energy with a single ROV sonar screen image and two short edited video clips that total approximately 2.5 minutes of the eight day survey.  Further, although two months have passed since BSEE and NOAA conducted the survey, Defendants have refused to provide Taylor Energy with the "X" and "Y" coordinates for Taylor Energy to use in its design of the containment system required under the Admin. Order.  As the Responsible Party, Taylor Energy was entitled to the same data and facts that the Government relied upon to issue the Admin. Order.

(E)     The Admin. Order is an incorrect application and interpretation of the previous response record and the evidence before the Unified Command.  In particular, it arbitrarily and capriciously revised the interpretation of a NOAA survey from 2012 and thus arbitrarily attempted to rewrite the response record.

(F)     In issuing the Admin. Order, Captain Luttrell and the Coast Guard refused to follow the procedures and protocols developed under the Unified Command structure,

consistent with the National Contingency Plan, pursuant to which no prior FOSC or Unified Command decision was ever reached in a non-collaborative manner. This includes all prior decisions based on the principles of sound science and extensive scientific study that were jointly and collaboratively developed, reviewed and vetted by all members of the Unified Command and their technical and scientific consultants, in an open and transparent manner, with a full sharing and disclosure of information, following best scientific practices and thus avoiding the risk of doing more harm than good to the environment.

(G)     The Admin. Order was unilaterally issued by the Coast Guard without full and reasonable consultation with Taylor Energy and was based on unverified scientific studies that were conducted outside the auspices of the Unified Command structure, contrary to prior procedures and protocols pursuant to which all scientific and technical discussions were done in a joint and collaborative manner, with a full sharing of information, so that best science, rather than "junk science," would be used to guide MC20 response activities.

(H)     Defendants failed to reasonably inform themselves of and take into consideration the containment domes that Taylor Energy constructed pursuant to Admin. Order 12-001 and that Taylor Energy presented in compliance with Admin. Order 19-001.

(I)     Defendants failed to follow the previous Unified Command endorsed "Process for Consideration of Solicited and Unsolicited Proposals" dated and approved August 24, 2016.

(J)     Defendants selected Couvillion pursuant to a flawed process in disregard of Couvillion's lack of qualifications, expertise and knowledge of prior response

actions and the prior scientific record, including the SSLWG Final Report, the
CERA Report and the Mixing Model Analysis, and the MC20 site characteristics,
the cumulative effect of which is to put at risk causing greater harm than benefit to
the environment;

(K)     Defendants failed to provide Taylor Energy with relevant and pertinent
documentation needed to comply with the Admin. Order and the Notice, including
a copy of the contract entered into between the Coast Guard and Couvillion as it
relates to the Admin. Order, copies of any and all ongoing communications between
Defendants and Couvillion as it relates to work being undertaken by Couvillion at
the MC20 site, and other data and facts that would allow Taylor Energy, as the
Responsible Party, to track and monitor the activities of Couvillion, which Taylor
Energy is entitled to receive to protect its legal rights and address its legal
responsibilities;

(L)     Captain Luttrell and the Coast Guard have failed and refused to act consistently
with their responsibilities for administering a Unified Command in contravention
of the National Contingency Plan, *see, e.g.*, 32 U.S.C. § 2702(b)(1)(B); 40 C.F.R.
§300.305;

(M)     Taylor Energy's Constitutional due process rights were violated by Defendants
exclusion of Taylor Energy from the Unified Command decision-making process
despite Taylor Energy's full participation and cooperation in the Unified Command
process for over a decade and its expenditure of hundreds of millions of dollars at
the direction of the prior FOSCs;

(N)     Defendants have failed to make decisions by taking into proper account all relevant factors and have failed to provide a rational basis to support their decisions and actions;

(O)     Defendants have acted without observance of the procedures required by law and within the meaning of 5 U.S.C. § 706; and

(P)     Defendants have failed to create and maintain a full and complete administrative record for the MC20 Incident.

90.

For all of the foregoing reasons, the arbitrary, capricious, abusive and illegal conduct of Defendants requires that the Admin. Order and all actions taken thereunder be vacated.

## COUNT III

## DECLARATORY JUDGMENT

91.

The allegations of paragraphs 1 to 74 are adopted as if copied herein *in extenso*.

92.

In accordance with 28 U.S.C. § 2201 *et seq.* and 5 U.S.C. § 703, Taylor Energy is entitled to a declaratory judgment as follows:

(A)     Declaring that Captain Luttrell and the Coast Guard violated the Due Process Clause of the Fifth Amendment to the United States Constitution and finding that Taylor Energy's due process rights were violated resulting from the issuance of the Admin. Order, the denial of Taylor Energy's request for reconsideration of the Admin. Order, the denial of Taylor Energy's request to postpone the November 2018 UC Meeting, the failure to provide Taylor Energy with the data and facts

supporting the Admin. Order, and the failure to provide Taylor Energy with a fair opportunity to challenge and question the Admin. Order and all actions taken thereunder;

(B)     Declaring and vacating the Admin. Order, the Notice and the Memo as being unlawful and in violation of 5 U.S.C. § 706 as arbitrary, capricious, an abuse of discretion and contrary to law; and

(C)     Declaring all actions of Captain Luttrell and the Coast Guard subsequent to the entry of the Admin. Order to be unlawful and in violation of 5 U.S.C. § 706, and specifically vacating any contract(s) between the Coast Guard and Couvillion related to MC20.

## COUNT IV

## REQUEST FOR INJUNCTIVE RELIEF

93.

The allegations of paragraphs 1 to 74 are adopted as if copied herein *in extenso*.

94.

In accordance with 5 U.S.C. § 702, Taylor Energy requests that the Court enter appropriate permanent mandatory or prohibitory injunctive relief against the Defendants following the Court's judicial review of the Admin. Order, the Notice, and all other actions taken by Defendants pursuant to the Admin. Order.

WHEREFORE, Taylor Energy Company LLC prays that the foregoing Complaint be deemed good and sufficient and that after due proceedings have been had including all discovery necessary to have a full and complete record, that the Court enter judgment in favor of Taylor Energy Company LLC and against Captain Kristi M. Luttrell, in her official capacity as Federal

On-Scene Coordinator for the MC20 Unified Command, and against the United States of America, Acting By and Through the United States Coast Guard, as follows:

1.    Vacating, holding unlawful and setting aside Admin. Order No. 19-001, dated October 23, 2018, and all actions, findings and conclusions made pursuant thereto, including the Notice of Federal Assumption dated November 16, 2018 and the Decision Memorandum dated November 16, 2018, as being in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution and arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law;

2.    For declaratory relief vacating and declaring Admin. Order 19-001, dated October 23, 2018, the selection of Couvillion Group, LLC, the Notice of Federal Assumption dated November 16, 2018 and Decision Memorandum dated November 16, 2018, to be unlawful pursuant to 5 U.S.C. § 706, to be in violation of Taylor Energy Company LLC's Constitutional right to due process of law, and to be unsupported by substantial evidence and issued without observance of procedures required by law;

3.    For appropriate permanent mandatory or prohibitory injunctive relief pursuant to 5 U.S.C. § 702 to enforce the rulings of the Court, specifically issued to the Federal On-Scene Coordinator, Captain Kristi M. Luttrell, and any and all subsequent Federal On-Scene Coordinators for the MC20 Unified Command, to carry out any rulings and judgment of this Court under penalty of contempt; and

4.    Award Taylor Energy Company LLC any other legal and equitable relief to which it is entitled and as the Court may deem appropriate, including costs and reasonable attorneys' fees.

Dated, this 20th day of December, 2018.

Respectfully submitted,

*s/ Carl D. Rosenblum*

CARL D. ROSENBLUM, T.A. (#02083)
RICHARD D. BERTRAM (#17881)
ALIDA C. HAINKEL (#24114)
LAUREN C. MASTIO (#33077)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 589-8296
crosenblum@joneswalker.com

**Counsel for Taylor Energy Company LLC,
Plaintiff**